## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

| | |
|---|---|
| AYMAN A. AMIN, | Civil No. 03-1181 (JRT/JSM) |
| Plaintiff, | |
| v. | **MEMORANDUM OPINION AND ORDER** |
| FLAGSTONE HOSPITALITY MANAGEMENT, LLC, d/b/a Hampton Inn, | |
| Defendant. | |

---

Kurt B. Glaser and Lisa D. Hill, **SMITH & GLASER LLC**, 331 North Second Avenue, Suite 250, Minneapolis, MN 55401, for plaintiff.

Joseph G. Schmitt, Cynthia P. Arends, and Michael E. Burns, **HALLELAND LEWIS NILAN & JOHNSON PA**, 220 South Sixth Street, Suite 600, Minneapolis, MN 55402 for defendant.

Plaintiff Ayman Amin ("Amin") brings claims of retaliation under Minnesota's Whistleblower Act, Minn. Stat. § 181.932; discrimination and retaliation under Title VII, 42 U.S.C. §§ 2000e- 2000e-17, the Minnesota Human Rights Act, Minn. Stat. §§ 363A.01-363A.41, and 42 U.S.C. § 1981; failure to provide a complete explanation for his termination under Minn. Stat. § 181.933; failure to provide a complete copy of his personnel file under Minn. Stat. § 181.961; and failure to provide him with notice of his right to continuing health care coverage under 29 U.S.C. § 1166, against defendant Flagstone Hospitality Management, L.L.C. ("Flagstone").

This matter is before the Court on defendant's motion for summary judgment and upon plaintiff's motion to strike affidavits from defendant's motion for summary judgment.  For the reasons set forth below, the Court grants defendant's motion for summary judgment with respect to all plaintiff's claims except for his personnel file claim and his COBRA claim, and denies plaintiff's motion to strike.

## BACKGROUND

Amin is originally from Egypt and has been living in the United States since 1996. In September 2000, Flagstone hired Amin to be the Assistant General Manager of a Hampton Inn that Flagstone operated in Minnetonka, Minnesota.   In January 2001, Flagstone gave Amin a $500 raise.  Amin complained about this amount, claiming that he was promised a $2000 raise.  Flagstone subsequently increased Amin's raise to $1500.

In October 2001, the Hampton Inn's position of General Manager was open. Mark Kucera ("Kucera"), Flagstone's Regional Manager, decided to promote Monica Jenkins ("Jenkins") to this position.  After announcing her promotion, the former General Manager, Brian Fannemel ("Fannemel") met with Amin, who asked why Fannemel had not recommended him to become the new General Manager.  Fannemel stated that he did not think Amin was ready to become a General Manager.  Although Amin alleges these facts in his complaint, he does not refer to them in his brief and focuses instead on the weeks leading up to his termination in February 2002.

**A.     Events Leading to Plaintiff's Termination**

By all accounts, Jenkins and Amin did not get along well with each other.  Amin alleges that Jenkins made racist remarks, specifically, "Do all of the people from Egypt ask stupid questions like you?" and "stupid middle-easterners."  (Amin Dep. at 324, 329.) Amin also alleges that Jenkins pressured him to fabricate various corporate documents and take money from cash registers to make up for shortfalls in the hotel safe.

In January 2001, Amin wrote a letter to Frank Garrett ("Garrett"), Flagstone's Chief Administrative Officer.  In this letter, he states that Jenkins's job performance is poor, that he has put in extra time and effort to help her perform the basic functions of her job, and that the failure to promote him is due to his national origin.  He also states that Jenkins downgraded his title to "Guest Services Manager," and that Jenkins comes to work smelling of alcohol and drinks alcohol in the hotel lobby with guests.

In response to his letter, Flagstone's Director of Human Resources, Rachel Turner[1] ("Turner"), telephoned Amin to discuss his allegations.  She explained why Flagstone had chosen to hire Jenkins.  Amin did not assert any additional examples of discrimination.  Flagstone also offers uncontradicted evidence that Flagstone made a company-wide title change from "Assistant General Manager" to "Guest Services Manager," and Amin does not dispute that his salary and benefits did not change.

Among Amin's duties were a number of tasks relating to direct billing, which included collection, balancing, and correction.  On February 8, 2002, Amin was asked to

---

[1] At the time of the events in question, Rachel Turner was known by her married name, Rachel Sennett.  For simplicity's sake the Court will refer to her as "Turner."

process a stack of direct billing invoices, which he regularly performed when Fannemel was the General Manager.  Amin did not complete the task, but instead placed the stack of invoices in Jenkins's mailbox with a note explaining that the total job of direct billing, of which processing the invoices is one part, required two people.  According to Amin, the invoice task had been given to a different employee because his other duties had increased so much under Jenkins.  Several days later, Jenkins told Amin that he had to start working with the invoices because the other employee was assigned to perform a different task.  Amin explained that he was already working extra shifts and that this additional task would be onerous.  Jenkins suggested that he could train the night auditors to do direct billing from the front desk computers.  Amin stated that the front desk computers do not have the requisite software, and that he would need access to the computer in her office.  Jenkins attempted to show him how to use the front desk computer to perform the task and was unable to do so.  She then ordered Amin to perform the task or face termination, locked her office, and left for the night.

The next day, Jenkins met with Amin to give him a disciplinary write-up, and also requested that Sulayman N'jie ("N'jie"), the hotel's Chief Engineer, be present to witness the meeting. It is not quite clear what happened at this meeting.  According to Jenkins, Amin became verbally abusive.  Amin offers N'jie's deposition testimony that Amin was not using any rude or threatening language, although his testimony is not exactly clear. Both sides agree that Amin left the meeting without Jenkins's permission.   After the meeting, both Jenkins and N'jie made written statements concerning the events at this meeting.  Jenkins also produced a written warning form, which she asked N'jie to sign,

but which Amin apparently refused to sign.   Amin then sent another letter to Garrett detailing problems with Jenkins's job performance.   He alleged that she made rude and racist remarks, expected him to perform her job duties, threatened to fire him, kicked him out of the office that they shared, and that she was "almost drunk all the time."   (Pl.'s Ex. 2.)

On February 15, 2002, Amin filed a discrimination complaint with the Minnesota Department of Human Rights, and he informed Jenkins of this fact on February 18.   She allegedly replied, "Stupid middle-easterners."   (Amin Dep. at 329.)   The next day, Kucera met with Amin, Jenkins, and N'jie to discuss Jenkins's frustration with Amin's job performance.   Kucera explained Jenkins's complaints.   There was also some discussion about a previous plan to groom Amin to become a manager, and Kucera expressed dissatisfaction that having put this plan in place, another problem had arisen.   The meeting ended with Kucera terminating Amin.

According to Kucera, he was solely responsible for the decision to fire Amin. Amin offers evidence that Jenkins was trying to have him fired.   Specifically, he offers several emails between Jenkins and a friend in which the friend advises Jenkins to tell her boss that Amin is not in the best interests of the hotel.   According to Amin, because Kucera used this phrase in terminating him, Jenkins must have been behind it.   Amin offers no evidence, however, that anyone but Kucera was responsible for the ultimate decision to terminate him.

On February 20, 2002, the day after his termination, Amin sent a letter to Flagstone requesting the reason for his termination.   On February 22, Amin sent another

letter requesting his personnel file.  On March 8, Flagstone sent him a copy of his personnel file, including the Personnel Action Form created upon his termination, which states he was terminated for "#2 (insubordination) and #6 (disrespectful conduc[t])." (Pl.'s Ex. 16 at 61.)

## B.      Allegedly False Documents in the Record

Amin has identified four documents in the record that he claims have been forged, falsified, or otherwise altered from their original form.  He does not request that these documents be stricken from the record, but rather claims that their existence demonstrates that Flagstone terminated him for an illegitimate reason.

### 1.      N'jie's First Written Statement

Flagstone submitted a copy of what it claims to be N'jie's written statement regarding the February 13, 2002 meeting.  (Kucera Decl. Ex. 2.)  This document is typewritten and N'jie's signature appears on the bottom.  During his deposition, N'jie testified that he never typed his statement, nor did he sign any typed statement.  He denied writing the substance of the statement, and agreed that while some of the statement was true, many things were taken out of context.

### 2.      Warning Form

Amin submitted a copy of a written warning form that Jenkins asked both N'jie and Amin to sign.  (Pl.'s Ex. 12.)  N'jie testified that while he recognized the type of form, he could not tell whether it was his signature on the bottom because the photocopy

was incomplete.  He also disagreed with the substance of the form, although the nature of his testimony is ambiguous and the differences fairly trivial.  Specifically, where the form states, "I clarified, was he refusing to accept a task assigned by the GM.  He stated yes," N'jie testified that Amin did not actually say yes, but instead explained that it was hard to work at the front desk and process the billing at the same time.  (Pl.'s Ex. 12; Pl.'s  Ex. 10 at 89.)  Additionally, where the form states, "Ayman walked out of the meeting saying that I was using rude, threatening language," (Pl.'s Ex. 12), N'jie testified that Amin did not use rude or threatening language.   According to Amin, these discrepancies demonstrate that the document has been falsified.

### 3.     N'jie's Second Written Statement

Kucera asked N'jie to write another statement concerning the final meeting at which Amin was terminated.  (Pl.'s Ex. 22.)  According to Amin, parts of this statement are missing, although Amin claims that the statement was originally four pages, and only three appear in the record, while N'jie testified that "If I do recollect, I think it was more than these two."  (N'jie Depo at 104.)  At any rate, N'jie does not disagree with the substance of the document and does not identify anything that he thinks has been removed.

### 4.     N'jie's Affidavit

Finally, Amin identifies an affidavit that N'jie was asked to sign, affirming that an attached typewritten document accurately reflected his recollection of the February 13, 2002 meeting.  (Pl.'s Ex. 24.)  N'jie signed the affidavit, but there was no document

attached.  N'jie thought that his original handwritten document would be attached, but it apparently never was.

## ANALYSIS

**A.    Plaintiff's Motion to Strike**

Plaintiff moves to have Kucera, Sandy Wilson ("Wilson"), and Turner declared unavailable under Fed. R. Evid. 804(a) and to have their affidavits stricken from the record.  Plaintiff also claims there are certain anomalies in Kucera's declaration that render it inadmissible.

The Court's original scheduling order called for completion of discovery by December 1, 2003.  The Court granted plaintiff two extensions, with the end result that he had until July 15, 2005 to take six depositions, including those of Kucera, Wilson, and Turner.  Amin did not successfully depose these individuals, and now claims that Flagstone should have given him updated contact information, as the information in the original disclosure is no longer accurate.  While Amin was able to schedule Kucera's deposition, it was abruptly cut short when Amin's attorney announced that because he doubles as a prosecutor he is a "law enforcement person" and he believed there would be a criminal prosecution stemming from this case.  He also advised Kucera of his Miranda rights.  (Pl.'s Ex. 9 at 3-4.)  Kucera consulted privately with Flagstone's attorney and elected to terminate the deposition.

### 1.     Rachel Turner

As an initial matter, it must be noted that Rule 804 concerns exceptions to the hearsay rule when a witness is unavailable to testify at trial.  A finding of unavailability under this Rule is necessary to invoke these exceptions and would not appear to have anything to do with the standards for evidentiary submissions under Fed. R. Civ. P. 56.

Nevertheless, using plaintiff's legal theory, it appears that plaintiff bears most of the blame for the lack of discovery.  Plaintiff has had well over a year to complete the desired depositions, and his brief in support of this motion offers no explanation for his failure to do so within the initial time limits set by the Court.  At oral argument, plaintiff suggested that the delay was defendant's fault because defendant failed to give plaintiff the discovery he would need to conduct a proper deposition.  The fact remains, however, that plaintiff could have deposed these witnesses earlier, and apparently chose not to do so.  Amin's attorney appears to have gone on vacation during part of the three-week period the Court granted him this summer to take the remaining depositions.  Rachel Turner returned his calls at least once during that period, but was never able to reach him. Under these facts, Turner cannot reasonably be characterized as unavailable.  The Court therefore denies plaintiff's motion to strike Turner's affidavit.

### 2.     Mark Kucera

Amin contends that Kucera invoked his Fifth Amendment right not to testify, that this makes him unavailable as a witness within the meaning of Fed. R. Evid. 804(a)(1), and that therefore his declaration is inadmissible under Fed. R. Civ. P. 56(e) because it

would not be admissible at trial.  The parties argue whether Kucera actually invoked any privilege, or merely terminated a voluntary appearance (because the deposition took place in Nashville, Flagstone points out that the subpoena, which issued from the District of Minnesota, was not valid).  Whether or not he invoked a privilege, however, Kucera has not been "exempted by ruling of the court on the ground of privilege," as required by the language of Rule 804(a)(1).  Without a court ruling, Rule 804 does not apply here.

Plaintiff also claims that there are a number of problems with Kucera's declaration.  First, he argues it is irregular because it is not notarized and is titled a "declaration."  Flagstone points out that under 28 U.S.C. § 1746, an unsworn declaration has the same force and effect as an affidavit.  Kucera's declaration complies with the requirements of § 1746.  Second, Amin claims that N'jie's statement, which is attached as an exhibit to Kucera's declaration, is a forgery.  Whether or not that is the case, Amin has offered no evidence that Kucera was involved in altering or forging that statement.  Finally, Amin points out that Flagstone has not provided the original copy of this declaration and observes that the final page has printing across the top indicative of a fax, and the remainder of the document does not.  There is nothing particularly sinister about that, however.  Given that Kucera lives in another state, it is quite possible that he faxed only the final page with his signature.  More importantly, Amin offers no evidence that Kucera did not actually make this declaration.  Federal Rule of Evidence 1003 provides that a duplicate is admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original.  Plaintiff has failed to raise any genuine

question as to the authenticity of this declaration, and his motion to strike it is therefore denied.

### 3. Sandy Wilson

At the time Flagstone identified her as a witness in February 2004, Wilson was a Human Resources Administrative Assistant for Flagstone in Memphis, Tennessee. Flagstone provided Amin with the address of the company's corporate office in Memphis. As that office is closed and Flagstone no longer employs Wilson, the address is no longer accurate. Flagstone has no current contact information for Wilson. Plaintiff argues that these circumstances somehow indicate that it is Flagstone's fault that plaintiff cannot locate Wilson. Again, however, plaintiff does not explain why he did not depose Wilson when Flagstone initially disclosed her address. Where one party apparently makes no effort to contact an identified witness for over a year, it cannot be said that that party has used "reasonable means" to procure the witness's testimony. *See* Fed. R. Evid. 804(a)(5) (defining a witness as unavailable when a party has been unable to procure the witness's attendance or testimony by process or other reasonable means). The Court therefore denies plaintiff's motion to strike Wilson's affidavit.

### B. Defendant's Motion for Summary Judgment

### 1. Standard of Review

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Only disputes over facts that might affect the outcome of the suit under the

governing substantive law will properly preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a court is required to view the facts in a light most favorable to the nonmoving party. *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 585 (8th Cir. 1987).

### 2.       Whistleblower Claim

To establish a prima facie case of retaliatory discharge under Minnesota's Whistleblower statute, Amin must show (1) statutorily protected conduct by the employee; (2) adverse employment action; and (3) a causal connection between the two. *Rothmeier v. Investment Advisors, Inc.*, 556 N.W.2d 590, 592 (Minn. Ct. App. 1996).

There are two types of statutorily protected conduct at issue: a refusal to perform an order that the employee has an objective basis in fact to believe violates the law, and a good faith report of a violation or suspected violation of law to an employer. Minn. Stat. 181.93, subd. 1(a), (c). Amin maintains that his refusal to obey Jenkins's orders to falsify fire and safety inspection documents and petty cash records, and his reports of these issues as well as her alleged drinking problems, constitute protected activities.[2]

---

[2] Flagstone points out that insofar as Amin's Whistleblower claim is based on allegations of retaliation for reporting discrimination, it is barred by the exclusivity of remedies provision of the MHRA. *Williams v. St. Paul Ramsey Med. Ctr.*, 551 N.W.2d 483, 483-86 (Minn. 1996). Amin has also pled a claim for retaliation based on reports of discrimination under Title VII, the MHRA, and 42 U.S.C. §1981, however, which are not so barred.

### a.     Reports of illegal activity

Amin contends he reported illegal activity to Flagstone on four occasions:  his two letters to Garrett, and his two discussions with Turner following those letters.  The two letters make no mention of Jenkins ordering Amin to falsify documents.  They do allege that Jenkins has a drinking problem.  Amin attempts to fit this within the framework of his Whistleblower claim by pointing out that, when Jenkins was on duty, she would have been responsible for carrying out a number of important tasks relating to the safety of hotel guests in the event of a fire.  Thus, he argues, his reports of her intoxication are reports of illegal behavior.

The law does not protect reports of mere violations of company policy, however, but requires a report of a violation or suspected violation of law.  *See Nichols v. Metropolitan Ctr. for Indep. Living*, 50 F.3d 514, 517 (8th Cir. 1995). The Minnesota Supreme Court has held that the "good faith" requirement of the law means that the reports must have been made for the purpose of blowing the whistle – that is, to expose an illegality.  *Obst v. Microtron, Inc.*, 614 N.W.2d 196, 202 (Minn. 2000).  Viewing the evidence in a light most favorable to Amin, there are no facts from which a jury could conclude that Amin's reports of Jenkins's intoxication was an attempt to expose an illegality.  In all his numerous reports, Amin made no mention of any concerns regarding fire safety or any other violation of law, but simply complained of Jenkins's "unprofessional" behavior, which he stated "is against any company's policy."  (Pl.'s Ex. 1; *see also* Pl.'s Ex. 2 (stating that Jenkins has a "drinking problem").)   The Court

therefore holds that Amin's reports of Jenkins's alleged drunkenness do not constitute protected activity under the Whistleblower statute.

In his affidavit dated August 25, 2005, Amin claims that he reported to Turner Jenkins's alleged theft of petty cash and attempts to get him to falsify documents. He explains that he is submitting the affidavit because during his deposition, Flagstone's attorney interrupted him and did not let him fully answer the questions. In his earlier deposition, however, Amin was asked to state what he talked about with Turner. He spoke at length, without any apparent interruption, and he only discussed his allegations of discrimination. (Amin Depo. at 275, 303-304.) Under these circumstances, the Court finds that Amin's affidavit does not create a genuine issue of fact concerning whether he reported any issues other than the alleged discrimination. *See Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1364-65 (8th Cir. 1983).

### b. Refusal to perform illegal acts

Amin also claims that he refused to forge various corporate records, but provides very little in the way of specifics. He mentions W-2 forms, fire extinguisher training certificates, and committee reports without fully explaining what Jenkins wanted him to do or what the certificates and reports are for, other than to pass the hotel's internal quality assurance inspections. Nor does he give examples of specific instances on which Jenkins ordered him to forge such documents. There is evidence that Jenkins once asked N'jie to sign a document regarding a fire inspection that had not taken place, which N'jie

refused to do; but there is no evidence that Amin was involved in that particular incident. (N'jie Depo. at 18-20, 34-35.)

Amin does, however, provide specific details regarding Jenkins's alleged orders to fake petty cash slips.  Amin could reasonably think that in following such an order, he would be participating in  what he suspected to be theft.  His allegations concerning the petty cash slips thus create a factual issue concerning whether he engaged in protected activity.

### c.    Adverse employment action

Amin's termination, of course, is an adverse employment action.   Amin also alleges that Jenkins subjected him to a number of other adverse employment acts.  They include:  increasing his work duties and hours of work; requiring him to reduce overtime pay to his employees while at the same time giving those employees more work; moving his desk to a public area; demoting him from Assistant General Manager to Front Desk Supervisor; requiring him to complete the direct billing task in an impossible manner, and then disciplining him for this failure; and making false claims of insubordination and failure to do his work to company management.

At the outset, moving his desk and his alleged demotion simply do not meet the definition of adverse employment action.  Amin suffered no decrease in pay, his duties remained substantially the same, and his title change was effected company-wide. *See Gagnon v. Sprint Corp.*, 284 F.3d 839, 851 (8th Cir. 2002); *Flannery v. Trans World Airlines, Inc.*, 160 F.3d 425, 428 (8th Cir. 1998). The other allegations are part of a pattern

Amin describes in which Jenkins apparently tried to make his job impossible to do.  A mere change in duties, even where such a change causes additional stress, is not considered adverse employment action absent a material change in the terms or conditions of employment.  *Ledergerber v. Stangler*, 122 F.3d 1142, 1144 (8th Cir. 1997).  At some point, however, piling on additional duties will result in a material change in the terms or conditions of employment, because it will be not humanly possible to perform all the work, and the employee will likely be fired or suffer other disciplinary measures.  As Amin was ultimately terminated, it is possible for him to argue that that is what happened in his case.  As discussed below, however, this claim fails because Amin has not established a causal connection between his termination and any statutorily-protected conduct.

### d.      Causal connection

Even if there are some fact questions regarding whether Amin engaged in protected conduct and suffered adverse employment action, the Court finds that this claim ultimately fails due to a lack of a causal connection between his firing and the increased workload.  Simply put, while there is abundant evidence from which a factfinder could infer that Jenkins was trying to get Amin fired, there is no evidence that Jenkins was involved in the ultimate decision.  The undisputed evidence is that Kucera alone made the decision to fire Amin.

Amin could argue that Jenkins was the ultimate author of his termination because she set him up to be fired, and because Kucera relied in part on N'jie's written

descriptions of Amin's rude behavior, which Amin contends were forged, probably by Jenkins.  Flagstone offers undisputed evidence, however, that Kucera met with Amin more than once, that Kucera himself witnessed Amin interrupt and argue with Jenkins, and that Kucera spoke with N'jie regarding Amin.  Under these circumstances, where the decisionmaker himself took the time to investigate the problems between his two employees, and there is no evidence or suggestion that Kucera knew of any protected conduct under the Whistleblower statute, the Court finds as a matter of law that there is no causal connection between Amin's alleged protected conduct and his termination.

Amin also makes much of Jenkins's email in which her friend suggests using the phrase "not in the best interests of the hotel."  The fact that Kucera also used this common phrase, without more, is not enough to suggest that there was a plot between Kucera and Jenkins based on a common desire to retaliate against Amin.  Undisputed evidence clearly demonstrates that Kucera, the decisionmaker, was faced with two incompatible and disputing employees and chose to credit one over the other.  That Kucera may have been wrong in his assessment of the relative value of these two employees does not give rise to a claim.  *See Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995) (explaining that courts do not sit as "super-personnel departments" reviewing the wisdom or fairness of employers' business judgments unless they involve intentional discrimination).  The Court therefore grants summary judgment to Flagstone on Amin's Whistleblower claim, and this claim is accordingly dismissed.

### 3.      Retaliation and Discrimination under Title VII, the Minnesota Human Rights Act, and 42 U.S.C. § 1981

Title VII prohibits retaliation against employees for opposing discrimination. 42 U.S.C. § 2000e-3(a).[3]   As with his Whistleblower claim, Amin must show (1) statutorily protected conduct; (2) adverse employment action; and (3) a causal connection between the two. *Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713-14 (8th Cir. 2000). Flagstone concedes that Amin's reports of discrimination are protected activities. While Amin told Jenkins on February 18, the day before his termination, that he had filed a claim with the Minnesota Department of Human Rights, Amin does not allege, nor does he offer evidence, that Kucera knew about Amin's letters or the Minnesota Department of Human Rights claim. As discussed above, Kucera alone made the decision to terminate Amin. There is thus no causal connection between Amin's protected activity and his termination, and the Court grants Flagstone's motion for summary judgment with respect to these claims.

### 4.      Failure to Provide Reasons for Termination

An involuntarily terminated employee may request the reason for the termination within 15 working days. Minn. Stat. 181.933, subd. 1. Minnesota law requires an employer to respond to such a request within ten working days. *Id*. It is undisputed that Amin made such a request on February 20, 2002 and that Flagstone sent his personnel

---

[3]   The parties treat Amin's retaliation claims under Title VII, the Minnesota Human Rights Act, and 42 U.S.C. § 1981 as one claim. The Court will therefore do likewise. With respect to Amin's discrimination claims under these statutes, he has not responded to Flagstone's motion for summary judgment and these claims are therefore dismissed.

file to him on March 8, 2002, including the Personnel Action Form listing "insubordination" and "disrespectful conduct" as the reasons for his termination. The file also included a memo from Kucera describing the meeting at which he terminated Amin and the reasons for the termination. (Pl.'s Ex. 16 at 62.)

Amin contends that this file does not satisfy the requirements of the law for two reasons. First, Amin argues that the file erroneously states he was fired for possession of a dangerous weapon, because it lists "#2" as one of the reasons. This is apparently a reference to a list of reasons for termination in the hotel's conduct policy, with "#2" being possession of a dangerous weapon. Amin suggests that this is evidence of inconsistency and proves that Flagstone has failed to provide the true reason. It is apparent from the form that this is a mere typographical error, however, as "#2" is immediately followed by "insubordination" in parentheses, the document does not otherwise refer to possession of a dangerous weapon, and Amin has identified no other place in the record where Flagstone claims he possessed a dangerous weapon.

Second, Amin contends the file Flagstone sent him was incomplete, and that he received an additional thirty-four documents after he filed this lawsuit. Because he did not receive all the documents relating to his termination, Amin argues, the notice was insufficient. The law does not require employers to provide every document relating to an employee's termination, however. A plain reading of the statute simply requires that the employer inform the employee, in writing, of the truthful reason for the termination. While Amin has provided copies of the documents missing from the original file, he has

not pointed to anything within them that is inconsistent with or in addition to the reasons for termination Flagstone originally provided.

Flagstone concedes that Amin may be entitled to $25 per day for the delay past the ten-day deadline. This penalty applies only if the employee has been injured by a violation of the Whistleblower statute, however. Minn. Stat. § 181.935(b); *Nichols*, 50 F.3d at 517. As Amin has failed to establish a prima facie violation of the Whistleblower statute, he is not entitled to recover anything for the delay. The Court therefore grants summary judgment to Flagstone on this claim.

## 5.    Failure to Provide Personnel Record

Amin contends that Flagstone failed to comply with Minn. Stat. § 181.961 because it withheld a portion of his personnel file. In support of this claim, Amin submitted approximately 33 pages of material that he claims should have been included in the file. Some of these pages are duplicates of documents he already received, and others are of no obvious relevance to this litigation, such as a photocopy of the envelope in which he sent his request for the file. In his brief, Amin does not distinguish between these extraneous materials and the documents relevant to his claim. At oral argument, however, Amin's counsel identified the specific documents that he contends should not have been withheld. They consist of a memo from Kucera dated February 21, 2002, (Pl.'s Ex. 19 at 58-59, 80-81); a memo from N'jie dated February 21, 2002, (*id*. at 60); another memo from N'jie dated February 14, 2002, (*id*. at 63); and a memo from Jenkins dated February 21, 2002, (*id*. at 56-57, 78-79).

Under Minn. Stat. 181.960, subd. 4, a personnel record is defined as:

> any application for employment; wage or salary history; notices of commendation, warning, discipline, or termination; authorization for a deduction or withholding of pay; fringe benefit information; leave records; and employment history with the employer, including salary and compensation history, job titles, dates of promotions, transfers, and other changes, attendance records, performance evaluations, and retirement record.  The term does not include:
>
> \*          \*          \*
>
> (2)  information relating to the investigation of a violation of a criminal or civil statute by an employee or an investigation of employee conduct for which the employer may be liable . . .
>
> \*          \*          \*
>
> (9) any portion of a written or transcribed statement by a coworker of the employee that concerns the job performance or job-related misconduct of the employee that discloses the identity of the coworker by name, inference, or otherwise[.]

Flagstone claims that these documents do not fit within this definition, and alternately, that some of them fall under the exception for documents relating to the investigation of a civil statute.  Due to plaintiff's failure to identify particular documents until oral argument, the parties' positions with respect to these specific memoranda are not quite clear.  It appears to the Court, however, that these documents could fit within the definition of "employment history with the employer."  While the N'jie memoranda could be excluded from the file under paragraph (9), Amin has raised a colorable issue of fact concerning the authorship of these documents.  Out of an abundance of caution, therefore, the Court will deny Flagstone's motion for summary judgment on this claim at this time.  In so doing, the Court observes that Amin's only requested relief under this claim appears to be that these documents be stricken from the summary judgment record.

As Amin has not moved for summary judgment in his favor, the Court will not strike the records, but the Court notes that it has not considered these documents in evaluating Flagstone's summary judgment motion.

### 6. Failure to Provide Notice of Continuing Coverage

The Consolidated Omnibus Reconciliation Act of 1985 ("COBRA"), 29 U.S.C. § 1161, provides employees with the opportunity to continue their group health coverage in the face of a qualifying event, such as termination. Amin alleges that while he received other correspondence from Flagstone following his termination, he did not receive notice of his right to continue his health benefits pursuant to 29 U.S.C. § 1166. Employers are required to act in good faith in attempting to comply with this notification requirement, and evidence that the employer mailed the notice to the employee's last known address fulfills this obligation. *Vanderhoof v. Life Extension Inst.*, 988 F. Supp. 507, 518 (D.N.J. 1997).

Flagstone offers evidence that Wilson, upon receiving a Personnel Action Form indicating that Amin had been terminated, prepared a COBRA notice, addressed an envelope using the address on the COBRA notice, recorded this letter in the Firm Mailing Book for Accountable Mail, and caused the letter to be mailed to Amin's last known address. While the Mailing Book provides confirmation that the letter was in fact mailed, it does not confirm that it was delivered or indicate to whom it was delivered, as a

certified mailing would.[4]  Amin points to the fact that the address recorded in the Mailing Book does not include a ZIP code; the ZIP code does appear on the COBRA notice from which Wilson copied the address to the envelope, however.  Amin also offers evidence that his correct address includes the street designator "North," and there is no dispute that Wilson did not include "North" on the envelope.  (Wilson Aff. ¶ 11.)

At oral argument, Flagstone's counsel contended that if the letter was sent to an incorrect address, it would have been returned to Flagstone.  The Court disagrees.  If the letter was in fact delivered to an incorrect address, it is at least as likely that the person who received it threw it away.  In a somewhat similar case, a court held that the defendant's failure to include "Northeast" in the street designation did not preclude summary judgment in the defendant's favor; in that case, however, there was undisputed evidence that the plaintiff herself had provided the allegedly incorrect address to her employer and that she had received other mail from her employer using that address.  *See Truesdale v. Pacific Holding Co.*, 778 F. Supp. 77, 81 (D.D.C. 1991).  Here, Flagstone offers nothing to show why "North" was not included, nor does it offer evidence that Amin received other mail without the "North" designation.  The Court therefore denies Flagstone's motion for summary judgment on this claim.

This case will be placed on the Court's next available trial calendar.

---

[4]  At oral argument, Amin's counsel contended that Flagstone corporate policy was to send such notices via certified mail, and that Wilson failed to do so.  While Amin asserts in his affidavit that all other correspondence he received from Flagstone was sent via certified mail, there is no evidence that Flagstone had a formal policy requiring COBRA notices to be sent in this manner.

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion for summary judgment [Docket No. 44] is **GRANTED in part** and **DENIED in part**;

2.  Defendant's motion is **GRANTED** with respect to the following claims in plaintiff's amended complaint [Docket No. 13]:  First Cause of Action (Discrimination and Retaliation); Second Cause of Action (Whistleblower); and Third Cause of Action (Violation of Minn. Stat. § 181.933); and these claims are hereby **DISMISSED WITH PREJUDICE**;

3.  Defendant's motion is **DENIED** with respect to plaintiff's Fourth Cause of Action (Violation of Minn. Stat. § 181.961) and Fifth Cause of Action (COBRA violation); and

4.  Plaintiff's motion to strike [Docket No. 93] is **DENIED**.

DATED:     November 14, 2005
at Minneapolis, Minnesota.

_____s/ John R. Tunheim_____
JOHN R. TUNHEIM
United States District Judge